IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LESLIE GREER, | § § § | |
| Plaintiff, | § | |
| v. | § § | CIVIL ACTION NO. 3:08-CV-160-M |
| RICHARDSON INDEPENDENT SCHOOL DISTRICT, | § § § § | |
| Defendant. | § § | |

# MEMORANDUM OPINION AND ORDER

Before the Court are Defendant's Motion to Exclude the Testimony of Plaintiff's Expert Witnesses [Docket Entry #81], Defendant's Motion for Summary Judgment [Docket Entry #83], Plaintiff's Third Motion for Summary Judgment [Docket Entry #85], and Plaintiff's Motion for Sanctions and to Strike Undue Financial Burden Defense [Docket Entry #98]. For the reasons explained below, Defendant's Motion to Exclude is DENIED, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part, Plaintiff's Third Motion for Summary Judgment is DENIED in part and GRANTED in part, and Plaintiff's Motion for Sanctions and to Strike is DENIED.[1] Plaintiff's letter request to the Court seeking a hearing on its Motion for Sanctions is DENIED as moot. A portion of Plaintiff's claims is DISMISSED for lack of standing. The Court also reserves, as explained below, its decision on a certain portion of the parties' cross-Motions for Summary Judgment pending a further filing from the parties.

---

[1] The Court observes the paucity of citations to the law in the fifty pages of Plaintiff's summary judgment brief, and further notes with disapproval the use of informal language that seesaws between flippancy and condescension. Sentences such as "Did you see that?" and "Think about it" are neither an acceptable nor appropriate way to address the Court. *See* Plaintiff's Brief in Support of Motion for Summary Judgment at 9, 14. It is also highly inappropriate for Plaintiff's counsel, Mr. Bailey and Mr. Carden, to have filed a brief that was obviously not proofread and thus contains internal notations to counsel such as "Cite case here." *Id.* at 48.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

On October 4, 2007, Plaintiff Leslie Greer, who uses a wheelchair, attended her son's junior varsity football game at Berkner High School. The stadium in which the football game was held (the "Berkner B Field") had no accessible handicapped seating in its bleachers, so Greer watched the game from a concrete walkway in front of the bleachers, behind a chain link fence that separates the bleachers from the track and field.

On February 1, 2008, Greer sued Defendant Richardson Independent School District (the "District"), claiming that the District discriminated against her by excluding her from participation in the benefits, programs and activities of a governmental entity receiving federal assistance, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA") and the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 and 794a (the "Rehabilitation Act"). The District is a governmental entity of the State of Texas and is subject to the requirements of the ADA, the Rehabilitation Act, and their relevant implementing regulations. Greer seeks a permanent injunction, declaratory relief, damages for violation of her civil rights, and attorneys' fees and costs.

On March 4, 2009, the Court granted leave for the District to amend its answer to assert the affirmative defense of "undue burden," and reopened discovery as to that limited issue. On July 9, 2009, the Court granted Greer leave to file a Second Amended Complaint, in which Greer expanded her claims to include other portions of Berkner B Field and added new contentions relating to alterations to Berkner B Field.

Both parties now move for summary judgment. The District also moves to exclude the testimony of Greer's expert witnesses, and Greer moves to strike the District's undue burden defense and for sanctions against the District's counsel.

ANALYSIS

I.  Standing

The District first alleges that Greer lacks standing to bring her claims. Because a defect in Article III standing is a defect in subject matter jurisdiction, a court must address this threshold issue before reaching the merits of a case.[2]

The Supreme Court held in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), that "[t]he plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical."[3] The Fifth Circuit applies the *Lyons* standard to claims for injunctive relief under the ADA.[4] Greer bears the burden of establishing standing.[5]

Greer states in her affidavit that she has twice returned to Berkner B Field since her initial visit in 2007: once to attend a football game that was rained out in October 2009, and once to attend a game there on November 11, 2009.[6] She also states that, because of her work with No Barriers, Inc., a non-profit organization dedicated to the removal of architectural barriers to the disabled, she will visit Berkner B Field again to see if it "continues to violate the [ADA's] requirements."[7] Greer's affidavit further states that the distance from her house to Berkner B

---

[2] *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94-95 (1998).

[3] *Lyons*, 461 U.S. at 101-02 (citations and internal quotation marks omitted).

[4] *See Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 563-64 & n.25 (5th Cir. 1998) (noting, in denying standing for failure to allege any probability of future injury, that "[t]he requirement articulated in *Lyons* is cited with relative frequency in cases denying injunctive relief").

[5] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted).

[6] *See* Greer's Reply, App. at 462, ¶ 11. The words "Motion," "Response," and "Reply," unless otherwise designated in these footnotes, refer to the Motions for Summary Judgment.

[7] *See id.* at 460, ¶ 2; 462, ¶ 12.

Field is about fifteen miles, that she has friends who have children in the District, and that she "fully expect[s]" to attend events at Berkner B Field in the future.[8]

Greer's standing to bring suit is questionable; the likelihood that she will attend future events at Berkner B Field is a source of conjecture. The sole reason for Greer's first visit to the stadium no longer exists—her son no longer plays junior varsity football, has just graduated from high school, and resides with Greer in another school district that is no longer aligned in the same sports league as the District.[9] However, the facts and intentions stated in Greer's affidavit support the conclusion that Greer's return to Berkner B Field is more than speculative or hypothetical, and that she will thereby suffer in the future what she claims is discrimination by the District.[10] The Court therefore finds that Greer has standing to pursue injunctive relief on her claims.

II.     Motion to Exclude Testimony of Plaintiff's Expert Witnesses

The District moves to exclude the testimony of Greer's two expert witnesses as untimely, unqualified and/or unreliable.

Greer retained J. Marshall Weaver, a general contractor, to provide a price quote for modifying the Berkner B Field bleachers to comply with ADA requirements. Weaver's testimony goes to the issue of undue burden. Because the Court does not reach that issue, the Motion to Exclude is DENIED as moot as to Weaver's testimony.

Greer retained Blair Baker to provide a report on the compliance of the facilities at Berkner B Field with technical ADA standards. The Court set an August 8, 2008 deadline for

---

[8] *See id.* at 462, ¶ 12.

[9] *See* District's Motion, App. at 292-93, ¶ 18; 270.

[10] *Accord Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F. Supp. 1357, 1365 (S.D. Fla. 2001) (holding that a wheelchair-bound individual's previous two attendances at events at a stadium, combined with his continued residence in the area, supported his contention that he would likely patronize the stadium in the future, and was therefore sufficient to confer standing to pursue his ADA claims).

the initial designation of experts. Greer's designation of Baker on August 18, 2009, was therefore untimely. Furthermore, his report appears to be based solely on his ability to read a tape measure and to use a level and a camera, which calls into question his qualification to testify as an expert.[11] Nevertheless, the Court will exercise its discretion to allow Baker to testify on the issue of ADA compliance. Baker is a registered accessibility specialist licensed by the Texas Department of Licensing and Regulation, with ten years of experience as a disability access expert.[12] The Motion to Exclude Baker's testimony is DENIED.

III. Cross-Motions for Summary Judgment

A. Standard of Review

Summary judgment is warranted if the pleadings, discovery, disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.[13] A genuine issue of material fact exists when a reasonable jury could find for the non-moving party.[14] The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.[15] Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate, by designating specific facts beyond the pleadings

---

[11] *See* District's Motion to Exclude, Ex. 2 at 210 (numbered by transcript page, not exhibit page).

[12] *See* Greer's Response to the District's Motion to Exclude, Ex. D at 1; *accord Wilson v. Pier 1 Imports (US), Inc.*, 439 F. Supp. 2d 1054, 1074 (E.D. Ca. 2006) (admitting expert testimony of a licensed contractor with six years of experience as a disability access expert, while observing that the task of assessing ADAAG compliance did not appear to be one that required any expertise).

[13] Fed. R. Civ. P. 56(c).

[14] *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[15] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

that prove the existence of a genuine issue of material fact.[16] In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."[17] On cross-motions for summary judgment, the court reviews each party's motion independently, construing the evidence and inferences in the light most favorable to the nonmoving party.[18]

    B.  The ADA Standards Applicable to the Berkner B Field[19]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[20] The United States Attorney General is authorized under the statutory language of the ADA to promulgate regulations implementing Title II.[21] These regulations, known as the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities ("ADAAG"), articulate minimum technical requirements for ADA compliance by new

---

[16] *See* Fed. R. Civ. P. 56(e)(2); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

[17] *Lynch Props.*, 140 F.3d at 625 (citation omitted).

[18] *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001) (citing *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994)).

[19] Greer also raises a claim under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which states, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

  Because the terms of Title II of the ADA and section 504 of the Rehabilitation Act, as well as the regulations implementing them, are so similar, courts apply the same standards to interpret them. *See, e.g., Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671 n.1 (5th Cir. 2004); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). The discussion relating to the ADA is therefore also applicable to the Rehabilitation Act.

[20] 42 U.S.C. § 12132.

[21] 42 U.S.C. § 12134(a); 28 C.F.R. § 35.151.

construction or alterations to existing facilities.[22]

Title II establishes less stringent requirements, however, for "existing facilities," which include "all or any portion of buildings, structures, sites, complexes . . . roads, walks, passageways [and] parking lots" that were in existence at the time of the ADA's enactment on January 26, 1992, and which have not been modified since that date.[23] Berkner B Field, which was constructed in 1968, is an "existing facility" for purposes of the ADA.[24]

With respect to such existing facilities, the regulations require a public entity to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[25] However, this "does not . . . [n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities . . . ."[26] The regulations do not provide specific objective compliance criteria for meeting this standard of "program accessibility."[27] Assessing

---

[22] 28 C.F.R., pt. 36 app. A. Section 504 of the Rehabilitation Act has similar standards known as the Uniform Federal Accessibility Standards (UFAS). *See* 41 C.F.R., pt. 101-19.6, app. A. Section 504 and Title II's general regulations regarding existing facilities are nearly identical. *Compare* 28 C.F.R. 42.521 *with* 28 C.F.R. 35.150. Public entities subject to Title II may comply with either set of standards when altering existing facilities or building new ones. *See* 28 C.F.R. § 35.151(c).

[23] 28 C.F.R. § 35.104; *see Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004); *Iverson v. City of Boston*, 452 F.3d 94, 99 (1st Cir. 2006); *Jones v. White*, 2006 U.S. Dist. LEXIS 61605, at *13 (S.D. Tex. Aug. 29, 2006) ("The program-access requirements for existing facilities under § 35.150 is more flexible and less stringent than requirements for newly constructed or altered facilities under § 35.151." (citations omitted)); *Assoc. for Disabled Americans v. City of Orlando*, 153 F. Supp. 2d 1310, 1320 (M.D. Fla. 2001) ("Because the facilities are 'existing facilities,' they are held to a much lower standard of accessibility, which is met if the programs presented at the facilities are readily accessible to disabled individuals."); *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 226 (S.D.N.Y. 1999) (describing program access as "the lesser standard for existing facilities under Title II").

[24] Berkner B Field is also an "existing facility" for purposes of the Rehabilitation Act, which was implemented on June 3, 1977 and which uses a substantially similar definition for "facilities." *Compare* 28 C.F.R. 42.521(a) *with* 28 C.F.R. 35.150(a).

[25] 28 C.F.R. § 35.150(a). The Rehabilitation Act provides similar standards for existing facilities that were constructed prior to its implementation date. 34 C.F.R. § 104.22(a).

[26] 28 C.F.R. § 35.150(a)(1).

[27] *See, e.g., Jones*, 2006 U.S. Dist. at *17.

program accessibility is therefore fact-specific, and to an extent is a subjective inquiry.[28]

C. Berkner B Field's Compliance with the ADA

To establish a prima facie case of discrimination under Section II of the ADA, a plaintiff must demonstrate that: (1) she is a qualified individual within the meaning of the ADA; (2) she is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination is because of her disability.[29] Once the plaintiff makes this prima facie case, a defendant may assert an affirmative defense by demonstrating that the requested actions would result in undue financial and administrative burdens.[30]

The parties disagree on the second element. Greer originally argued that watching the football game together with other fans in the bleachers is an integral part of the "program" offered at Berkner B Field, such that she was denied program access by being relegated to watching the game from the concrete surface in front of the bleachers. She later amended her complaint to argue that various aspects of Berkner B Field fail to meet ADAAG technical requirements, and that the facility therefore does not provide program accessibility.

The District responds that, although Berkner B Field's bleachers are not wheelchair-accessible, the stadium, when viewed in its entirety, is accessible to wheelchair-bound individuals and thus provides program accessibility. In essence, the District's position is that it

---

[28] *See id.* at *17, *20-21 ("The expert testimony on both sides of this case reflected the same understanding that there is no clear or specific test for analyzing 'usability.' While the standards for altered facilities are a helpful reference point in evaluating barriers to access within existing facilities, the requirements for altered facilities cannot be wholly imposed on existing facilities.").

[29] *Frame v. City of Arlington*, 435 F.3d 432, 435 (5th Cir. 2009) (citing *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004)).

[30] *See* 28 C.F.R. § 35.150(a)(3); *Tennessee*, 541 U.S. at 532.

is not required under the ADA or the Rehabilitation Act to address Greer's personal dissatisfaction with the available seating choices at Berkner B Field. While admitting that the existing facilities at Berkner B Field do not all meet ADAAG requirements, the District argues that non-compliance with ADAAG requirements is not determinative of program accessibility.[31]

The District is correct as to the proper legal standard for existing facilities. Failure to meet ADAAG standards is relevant, but not determinative; public entities have flexibility to choose how to create program accessibility.[32] They are not required to make structural changes to existing facilities, or meet ADAAG technical measurements, if they can achieve compliance through other methods.[33] In assessing whether the District provides disabled individuals with program access, this Court must view Berkner B Field in its entirety, and consider compliance with ADAAG requirements in light of the actual experiences of wheelchair-bound individuals who attempt to access the facility.

Under this standard, Greer fails to present a prima facie case. While the experience of physically being with other fans is certainly a part of the overall experience of attending a sporting event, sitting specifically in the bleachers is not such an integral part of that experience that inability to access the bleachers constitutes denial of program access. Nothing prevented

---

[31] Greer repeatedly argues that the District's expert witness, Michael Longanecker, agreed that the facilities at Berkner B Field were not accessible. This characterization is misleading at worst; at best, it consistently confuses the different standards that apply to new/altered and existing facilities. Longanecker's testimony, when placed in context, clearly states that specific elements of Berkner B Field did not comply with ADAAG requirements, but that the program as a whole is nevertheless accessible.

[32] *See Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 (1st Cir. 2000) ("Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available."); *Jones*, 2006 U.S. Dist. LEXIS at *20-21; *Access Now*, 161 F. Supp. 2d at 1368 ("Deviation from the standards if relevant but not determinative; it is one consideration from which the court may conclude that noncompliance impedes access."); *Pascuiti*, 87 F. Supp. at 226.

[33] *See* 28 C.F.R. § 35.150(b)(1); *Tennessee*, 541 U.S. at 511 ("Title II's implementing regulations make clear that the reasonable modification requirement can be satisfied in various ways, including less costly measures than structural changes.").

Greer's companions from sitting with her in front of the bleachers that night.[34]  Debbie Smelko, a wheelchair-bound parent of three current and former District students, testified that she has attended numerous athletic events at Berkner B Field and has always been able to sit with companions on the track, or at any other location where she chose to sit.[35]  Shenikwa Nowlin, also a wheelchair user, has regularly attended events at Berkner B Field since 2002 and sits on the track, where her companions are allowed to sit with her in their own chairs or in chairs provided by the District upon request.[36]  Finally, while Greer complains that her view of the game from the concrete surface was partially blocked by the band,[37] Smelko testified that the track provides a better view than a seat in the bleachers.[38]

Greer's own testimony shows that events at Berkner B Field as a whole are accessible to wheelchair-bound individuals.  She was able to park at the stadium, buy a ticket, navigate from the parking lot to the field, buy concessions from the concession stand, and watch the football game from the flat concrete area in front of the bleachers.[39]  Greer's experience, while unsatisfactory to her, does not contradict the deposition testimony of Smelko and Nowlin.  Smelko testified that she has never had any difficulty accessing the stadium's parking lot, curb, sidewalks, routes, ticket booth, and concession stand, nor has she ever encountered any difficulty in navigating within the stadium.[40]  Smelko testified that she normally sits on the track, which is always available as an alternate viewing area, even during track meets.[41]  Nowlin testified that

---

[34] *See* District's Motion, App. at 273 (Greer deposition).

[35] *See id.* at 296, ¶ 10 (Smelko Declaration).

[36] *See id.* at 469, ¶ 4; 470, ¶ 6; 471 ¶ 8 (Nowlin Declaration).

[37] *See id.* at 277.

[38] *See id.* at 296-97, ¶ 10.

[39] *See id.* at 269, 271-72.

[40] *See id.* at 295, ¶¶ 5-6.

[41] *See id.* at 296, ¶ 7.

she is able to park her car in the accessible parking area, enter the stadium, navigate inside the stadium, access the concession stand, use the women's restroom without assistance, and view events from the track.[42]

Greer argues that the personal experiences of wheelchair-bound individuals are inapplicable to the determination of program accessibility, attacking the testimony of the District's witnesses on the grounds that neither individual was familiar with the ADAAG.[43] She offers, instead, the expert report of Blair Baker opining that multiple elements of the facilities at Berkner B Field do not meet ADAAG standards.

While ADAAG technical requirements for new or modified facilities are a helpful reference point in evaluating barriers to access within existing facilities, the Court cannot determine that the District is in violation of the ADA from finding that specific elements of existing facilities identified in an expert report deviate from the ADAAG.[44] The requirement under the ADA is to provide access to the program, not to meet ADAAG standards.

An example from Baker's report illustrates this difference. Baker determined that the alternative seating on the track did not meet ADAAG standards because it felt unbalanced and "very spongy" when he walked upon it.[45] When asked whether a wheelchair could roll on the track surface, he responded: "I'm not disabled. I've never had the unfortunate situation to have to use a wheelchair. And I don't have any idea."[46] While Greer's expert may or may not be correct that the track does not meet ADAAG standards, the only testimony from individuals who have actually used a wheelchair on the track—Greer herself has not—clearly supports the

---

[42] *See id.* at 470-71, ¶¶ 5-8.

[43] *See* Greer's Response at 21-22.

[44] *See* fn. 32, *supra*.

[45] District's Motion to Exclude, Ex. 2 at transcript page 202.

[46] *Id.* at transcript page 204.

conclusion that the track is accessible to wheelchairs users. Smelko stated in her deposition testimony that the track's surface is a good, solid surface for wheelchairs, and that the wheelchair wheels do not sink into its surface.[47] Nowlin stated that it is a level, smooth, and stable surface, and that its rubber surface, being similar to the rubber casings of her wheelchair's tires, facilitates her movement.[48]

The District's Motion for Summary Judgment is therefore GRANTED, and Greer's Motion for Summary Judgment is DENIED, as to the existing facilities at Berkner B Field. The Court therefore does not reach the District's affirmative defense of undue burden, nor does it consider the District's separate argument for summary judgment on Greer's Rehabilitation Act claim.[49]

### D. Newly Renovated Portions of Berkner B Field

Certain parts of Berkner B Field have been modified since the ADA's implementation date.[50] Specifically, in 2005, the District rebuilt the ticket booth, installed a new curb cut and added two handicapped parking spaces directly in front of the new ticket booth.[51] In 2007, the District also built a new ramp from the sidewalk to the parking lot, identifying two other handicapped parking spaces adjacent to the new ramp.[52] In 2009, the District renovated Berkner B Field's bathroom facilities.[53]

The relevant regulation for facilities built or altered after the ADA's implementation

---

[47] *See* District's Motion, App. at 296, ¶ 8.

[48] *See id.* at 470, ¶ 6.

[49] *See* fn.19, *supra*.

[50] The Court notes that its review of Greer's Motion as to the newly renovated portions was severely hampered by Greer's repeated failures to accurately cite to the record.

[51] *See* Greer's Motion, App. at 204, ¶ 9 (Longanecker Affidavit).

[52] *See id.* at 205-06, ¶ 12.

[53] *See id.* at 206, ¶ 15.

states:

> Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.[54]

Alterations made in conformance with either ADAAG or UFAS minimum technical requirements are deemed, *ipso facto*, to comply with this requirement.[55] Departures from particular requirements of either standard are only acceptable "when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided."[56]

Greer complains that some of the District's 2005 and 2007 modifications do not meet ADAAG requirements.[57] Specifically, she alleges that the handicapped parking spaces provided by the District are fewer than the ADAAG requires; that the curb cut does not meet ADAAG standards (without providing any details); and that the ramp from the parking lot to the sidewalk is too steep and pools water at the bottom.[58]

The District states that these alterations were made in a "good-faith effort to increase accessibility" to disabled individuals.[59] It is not clear whether efforts to make facilities more accessible to disabled individuals qualify as "alterations" that trigger a duty to meet the higher ADA standards.[60] However, such efforts necessarily affect the "usability" of Berkner B Field for

---

[54] 28 C.F.R. § 35.151(b).

[55] *See* 28 C.F.R. § 35.151(c); 28 C.F.R. 36, App. A; *Tennessee*, 541 U.S. at 532 (citing 28 C.F.R. § 35.151).

[56] 28 C.F.R. § 31.151(c).

[57] Greer also claims that the District used Baker's report to secretly modify the restrooms in 2009 to meet those requirements. However, as Greer does not dispute that the newly altered restrooms comply with the ADAAG, any complaint as to the restrooms appears to be moot.

[58] *See* Greer's Motion at 48-49.

[59] District's Response at 19.

[60] The Court is aware of only one case, *Association for Disabled Americans v. City of Orlando*, 153 F. Supp. 2d 1310 (M.D. Fl. 2001), in which the alterations at issue were specifically made in an effort to make a facility more accessible to disabled individuals, rather than alterations that only incidentally affected access for the

individuals in wheelchairs, and therefore appear to trigger such a duty under 28 C.F.R. § 35.151(b). While efforts to improve accessibility are to be encouraged, the Court finds that, having chosen to alter certain portions of Berkner B Field, the District must meet its burden to make those portions "readily accessible to and usable by individuals with disabilities."[61]

Greer first argues in her Motion that the District's two handicapped parking spaces are fewer than the law requires.[62] However, the affidavit of the District's expert states that four handicapped parking spaces are available in the parking lot: two directly in front of the new ticket booth on the western side of the stadium, and two adjacent to the new ramp at the southwest entrance to the parking lot.[63] It is unclear from Greer's expert's report how many parking spaces he counted; he merely states: "The minimum number of accessible parking spaces required by Table 2, based on the total number of accessible parking spaces provided in the larger parking lot adjacent to this facility, does not appear to be provided."[64] As the "Table 2" referenced in Baker's report is not before the Court, the Court finds that there is a genuine issue of material fact as to whether or not the number of handicapped parking spaces meets ADAAG requirements. The Court therefore reserves its decision on the parties' Motions for Summary Judgment as to the number of parking spaces, pending a joint stipulation from the parties as to how many handicapped parking spaces there are, and whether that number meets

---

    disabled. However, that court declined to decide whether such alterations triggered a duty to make the altered elements "usable" and "readily accessible." *See id.* at 1319.

[61] *But see Orlando*, 153 F. Supp. 2d at 1319 ("Each of these alterations appears to have affected the 'usability' of the theater; however, the end result of those alterations was to make the facilities more accessible to disabled individuals. To the extent that an obligation to make the facilities more accessible was triggered by those alterations, the Court finds that the obligation was met."). However, in this Court's view, that analysis sets up a straw man. The obligation is not "to make facilities *more* accessible," but to make the altered portions "readily accessible" and "usable." 28 C.F.R. § 35.151(b).

[62] *See* Greer's Motion at 48.

[63] Greer's Motion, App. at 204, ¶ 9; 206, ¶ 12.

[64] *See id.*, App. at 5, ¶ 4.6.1.

ADAAG requirements.

Greer next alleges that the curb cut does not meet ADAAG standards, though she does not state how it fails to do so. The only fault identified in Baker's report appears to be the absence of a "detectable warning surface."[65] The report explains:

> Detectable warnings shall consist of raised truncated domes . . . and shall contrast visually with adjoining surfaces, either light on dark, or dark on light. The material used to provide contrast shall be an integral part of the walking surface. Detectable warnings used on interior surfaces shall differ from adjoining walking surfaces in resiliency or sound on cane contact.[66]

The description of these missing warnings leads the Court to conclude that the warnings are intended for the benefit of the visually impaired, not for individuals in wheelchairs. An architectural barrier must be related to the plaintiff's disability in order for her to have standing to sue for its removal.[67] Greer's Motion for Summary Judgment is therefore DISMISSED as to the curb cut.

Finally, Greer complains that the steepness of the ramp and its design, which permits water to pool at the bottom, violate the ADAAG.[68] The District does not present any admissible evidence to dispute Baker's report on this subject. Rather, the District argues that Greer lacks standing to press her claim as to the ramp because she did not attempt to access the ramp.

The Fifth Circuit does not appear to have directly addressed the issue of whether a plaintiff must have personally encountered an architectural barrier in order to have standing to bring suit for its removal.[69] In the absence of a binding precedent, the Court finds persuasive the

---

[65] *See id.*, App. at 5, ¶ 4.7.7; 10, ¶ 4.29.2.

[66] *Id.*, App. at 10, ¶ 4.29.2.

[67] *See, e.g., Ass'n for Disabled Americans v. 7-Eleven, Inc.*, 2002 WL 546478, at *4 (N.D. Tex. Apr. 10, 2002) (Sanders, J.) (in the context of Title III claims).

[68] *See* Greer's Motion, App. at 6, ¶¶ 4.8.2, 4.8.8.

[69] In *Frame v. City of Arlington*, 575 F.3d 432 (5th Cir. 2009), the Court held that the statute of limitations on a plaintiff's claim for injunctive relief under the ADA accrues on the date a noncompliant construction or

reasoning of the Eighth and Ninth Circuits, which have held that a plaintiff is not required to make the futile gesture of encountering each architectural barrier at a particular facility before suing for injunctive relief as to all barriers related to her disability.[70] The Court therefore finds that Greer has standing to sue for injunctive relief as to the ramp.

Because there is no genuine issue of material fact that the ramp does not comply with ADAAG requirements, Greer's Motion for Summary Judgment is GRANTED, and the District's Motion is DENIED, as to the ramp.

IV.     Motion for Sanctions and to Strike

Greer moves for sanctions against the District's counsel under Rule 11, and moves to strike the District's undue burden defense, on the grounds that the District's counsel misrepresented to the Court the existence of evidentiary support for that defense. Both Motions are DENIED.

---

alteration is complete, basing its reasoning on the fact that the injury (noncompliant curbs, sidewalks and parking lots) is not latent, and that a public entity ought to be protected against stale claims. *Id.* at 439-41. However, this holding as to accrual of a claim clearly does not apply to a plaintiff's standing to sue; otherwise, the "injury-in-fact" prong of the standing analysis would be entirely thrown out the window. The issue of standing is more directly addressed , albeit as dicta, in the minority opinion, which states that, "to suffer an injury under Title II of the ADA, the qualified individual must have *actually encountered* the discrimination or *actually be deterred* from visiting the public accommodation because of exclusion from or denial of the benefits of a service, program, or activity." *Id.* at 443(Prado, J., concurring in part and dissenting in part) (citations omitted).

[70] *See, e.g., Steger v. Franco, Inc.*, 228 F.3d 889, 894 (8th Cir. 2000) ("Burch need not encounter all of these barriers to obtain effective relief. The effect of such a rule would be piecemeal compliance. To compel a building's ADA compliance, numerous blind plaintiffs, each injured by a different barrier, would have to seek injunctive relief as to the particular barrier encountered until all barriers had been removed. This not only would be inefficient, but impractical."); *Chapman v. Pier 1 Imports (U.S.) Inc.*, 571 F.3d 853 (9th Cir. 2009) ("[W]hen a disabled person encounters accessibility barriers in a facility and would return to that facility if it were accessible, he or she has been injured by the deterrent effect of the barriers actually encountered *and* additional barriers he or she might encounter on future visits. Moreover . . . it is impractical and inefficient to expect that a person, who is deterred from entering a facility, because he or she has encountered accessibility barriers, would attempt to reenter the facility and to experience each ADA violation related to his or her disability.") (citations omitted) (emphasis original); *Doran v. 7-Eleven*, 525 F.3d 1034, 1047 (9th Cir. 2008) ("An ADA plaintiff who has Article III standing as a result of at least one barrier at a place of public accommodation may, in one suit, permissibly challenge all barriers in that public accommodation that are related to his or her specific disability.").

CONCLUSION

For the reasons stated above, Defendant's Motion to Exclude the Testimony of Plaintiff's Expert Witnesses is DENIED as moot as to J. Marshall Weaver and is DENIED as to Blair Baker. Defendant's Motion for Summary Judgment is GRANTED, and Plaintiff's Motion for Summary Judgment DENIED, as to the existing facilities at Berkner B Field. Plaintiff's claim as to the altered curb cut is DISMISSED. Plaintiff's Motion for Summary Judgment is GRANTED, and Defendant's Motion for Summary Judgment is DENIED, as to the new ramp. Plaintiff's Motion for Sanctions and to Strike Undue Financial Burden Defense is DENIED, and Plaintiff's request for a hearing on its Motion for Sanctions is DENIED as moot.

The Court reserves a decision on the parties' cross-Motions for Summary Judgment as to the altered handicapped parking spaces. On or before August 12, 2010, the parties may submit a joint stipulation as to the number of parking spaces and submit law on the number of spaces required. The Court will issue a Final Judgment in a separate Order following receipt of the stipulation.

**SO ORDERED**.

August 2, 2010.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS